Next case we'll hear this morning is Belton v. Loveridge. And Mr. Bader, whenever you're ready, we'll hear from you. Good morning, Your Honor. May it please the Court. Stephen Bader from Cranfield-Sumner in Raleigh, North Carolina, here on behalf of the appellant Heather Loveridge. On November 1st of 2019, Heather Loveridge, a uniformed Charlotte police officer, fired at her colleague, the plaintiff in this case, a plainclothes officer named Clarence Belton. The shooting happened after Belton and several other plainclothes colleagues were involved in a shooting inside of a suspect's garage. It happened seconds later as Belton came out of that garage towards Officer Loveridge. The District Court denied Officer Loveridge's motion for summary judgment. There are two issues before this Court today. The first is jurisdiction that my friend has raised, whether this Court can review the denial of summary judgment. And the second is whether Officer Loveridge is entitled to qualified immunity under the undisputed facts. And to begin with the jurisdictional argument, this Court can review the denial of summary judgment, I'm sorry, the denial of qualified immunity at summary judgment under the collateral order doctrine if the decision turns on a question of law. Whether an officer's use of force is objectively reasonable is a question of law. Not based on these, you'd have to have us rewrite the facts as the District Court found them. I don't agree with that, Judge Thacker, and here's why. The Court sets forth the party's contentions and says the plaintiff makes a contention about the light, the defense disagrees. The plaintiff makes a contention about whether she was in fact hit by the bullets and the defense disagrees. And then the key one that they keep coming back to, which is the plaintiff takes the position that Officer Loveridge should have seen or recognized him as a plainclothes officer before the shooting. That's not a question of fact. That's a question of reasonableness. When looking at this Court's precedents, when there's an evidentiary dispute as to how something happened, then that dispute needs to be resolved first. It seems to me there is, the District Court identified, I think you're right, reasonableness is a question of law. The Supreme Court has said that, we've said that. But if there are questions of fact about what happened, those can preclude the award of sovereign immunity. And I think there's a good argument we don't have jurisdiction if the denial of qualified immunity is based on disputed facts. And it seemed to me the District Court was saying that. Where I thought you were going to go was, you know, the qualified immunity analysis has two prongs. And what we don't have, or what I don't, what it seems questionable to me is whether we have from the District Court a determination that in the, if you construe the evidence and the like most favorable to the plaintiff, that that right is clearly established. I mean, the order cites the clearly established proposition but doesn't identify the right and doesn't say why it's clearly established. And that may not matter if it's a clear question for us, but it matters a lot if it's not a clear question for us. So, you know, maybe you want to make the argument that the facts here are undisputed and we can look at it. I think that's a tall order. I think your better argument is to say we've set forth how you do qualified immunity and we can't really judge the clearly established issue based on the District Court's order. Well, Judge Qualam, I think that's right. And I'm not necessarily accepting your challenge, but I want to just deal with the idea that there's a dispute here. And looking at this Court's recent decision that we cited in Supplemental Authority, Rambert v. City of Greenville, what this Court said is that the District Court denied summary judgment. You had an officer that was involved in a shooting with a mentally ill individual. And the District Court said that there was a question about whether the officer should have recognized that that individual was mentally ill. And then there was a related question as to whether making that recognition, a mentally ill individual who's unarmed would pose a threat to the officer. That's not a question about how the events happened. That's a question about how the officer perceived the events and responded to the events, which is functionally. At least two of us know a good bit about Rambert, probably three of us. I don't want to get too off track, but in Rambert, the question was there was only one way this could be perceived. And in this case, the issue is should Officer Loveridge have realized that Officer Belton was an officer or not? And there's a dispute about whether that was something that was apparent or not. So, I mean, you can keep going down this thing. We can't consider disputed facts. Well, let me then get to the qualified immunity issues that Judge Quattlebaum laid out, because I think we can still get to the same, our request for relief, which would be to reverse and find that Officer Loveridge is entitled to qualified immunity. When we look at this Court's case law, the two cases that are the best analogs for these facts are McLennigan v. Carnes, I'm sorry, McLennigan v. Carnes and Milstead v. Kibler. And in both of those situations, what you had was an individual, an officer on scene, where there was a threat in the form of a gun. Either an individual who is said to have had a gun in such a way that they may intend to use it, or an individual that, in fact, did have a gun, had made a threat to another, such that the officer, another officer on scene, had fired in response. And after that happened, the officer had seconds to react to somebody coming at them who they did not know. And in response to that threat, chose to fire. And in both instances, what this Court has recognized is that qualified immunity protects an officer from a split-second decision to use lethal force in a situation like that. Were those police-on-police cases? They were not, no, Your Honor. So those are situations where the victim of the shooting was someone that created a split-second situation. Yes, but I would add that in both of those cases, those plaintiffs were not suspects of any kind of a crime. They just happened to be in the wrong place at the wrong time. And also, you just said again that they did not know. That's going back to the fact, here that's disputed, whether or not Officer Loveridge knew that Officer Belton was not a suspect before she shot him 14 times as he was crawling out of the garage. What I would say to that is that the testimony from Officer Loveridge is that she did not recognize him as such. That's what I keep telling you. You keep going back to wanting us to revisit facts that the District Court found to be in dispute. And that we cannot do. Well, I'm not going to help you. You go right ahead. Well, I was going to go back and question whether, this goes back to what Judge Quattlebaum was asking you, is whether there was a constitutional right at all implicated in the sense that the Constitution protects unreasonable searches and seizures. This was a seizure, intended seizure, of this fellow McConaughey, whatever his name was. She was not intending to seize Belton. And the excessive force was apparently directed, if you accept it as excessive, directed against Belton. But that was not a seizure. That was a tort at worse, a common law tort. She made a mistake. The difficulty I have, even in the analysis of the facts, is that we have always asserted that we have to take the facts from the perception of a reasonable officer in her position. And so we can't, and she clearly did not recognize him as Belton. The argument your counsel makes is she did recognize him as Belton and shot him. Because there was good light there. Now, that is an unreasonable conclusion, and I think it's an unreasonable fact. There's no suggestion that she intended to shoot a fellow officer. She shot him by mistake. I think it's pretty, the record pretty supports that. Now, if you shoot a fellow officer, it's a friendly fire case. This is not a seizure of a criminal suspect where excessive force is being used. So the question is, where is the clearly established constitutional right of this man, who has been the victim of a tort, when there was no seizure made? The Fourth Amendment protects against a seizure, and she wasn't seizing Belton. Well, that's right, Your Honor, and I think to sort of unpack that, I think, number one, there is no constitutional violation at all. Certainly, the court could come to that conclusion, since that wasn't the... And that's a fair point, and to me, that's why we've got to discuss clearly established. There, I don't recall if you've cited them, but there's two Ninth Circuit cases and one Eighth Circuit case that involve a similar situation to this. A police-on-police fire where the officer was not, there was an intended shot, but a mistaken belief that it was an officer. And they said that a shooting like that is excessive force and is a Fourth Amendment violation. And outside the officer world, we've said that, right? I mean, we say excessive force is a taking. We could debate whether that's really faithful to the language of the Fourth Amendment, but we don't, I don't think, have the option of doing that as a panel here. So there is some law out there that would say, hey, this is not just a tort. It's a constitutional Fourth Amendment issue. But that's two Ninth Circuit cases, one Eighth Circuit. There's no Fourth Circuit law. There's no Supreme Court law. And we've really not really framed the right to assess that. And so it seems to me that's the issue here is we say there's disputed questions of fact, but there may or may not be, even in the light most favorable to the plaintiff, a clearly established right here with respect to a mistaken shot at an officer. And I think that's the way to do it, Your Honor. I think that that's the way you can look at it. I mean, we did point out. Okay. Let's assume we're doing that. We could always send it back and say district court, do that.  What's, I mean, what, I didn't see a case that said the other either. I didn't say there's not another circuit that says, well, no, this is a tort. And there's law that says the police have the same, don't have watered-down constitutional rights. So true, we don't have a case, and maybe that's enough, but I don't think the absence of a case is fatal or absolutely means it's not clearly established. What's the basis of saying it's not apparent that if you shoot an officer that you perceive that, again, in the light most favorable to the plaintiff, you shoot an officer who has all the appearance of an officer, that that's not a taking? What's your argument there? Well, there's no cases from this circuit that would involve even remotely similar facts that they would put an officer, such as Officer Loveridge, who's asked to come in and provide backup support for plainclothes officers that she's not interacted with before, that they would have a clearly established right two to four seconds after a shooting involving this suspect to be free from any mistaken identity or mistaken shooting. The question is probably a little more complex than I posited. It seems to me when you shoot an officer, even if that officer is fully dressed and you can recognize he's an officer, if you weren't attempting to seize him, you just sued him. It's murder. It's a crime. But the Fourth Amendment is what we're looking at, and the Fourth Amendment limits the way we investigate and prosecute crimes. We search, limitations on searches and limitations on seizures. And if the one officer was trying to seize the other officer as a suspect of some kind and shot, there's an excessive force case under the Fourth Amendment. But when the officer does not intend to kill his own kind in the sense of another officer as part of his seizure of that officer, we have a tort maybe, but we don't have a Fourth Amendment. Now that doesn't fully answer it because the intended seizure here was against McConaughey. McConaughey. McConaughey. And McConaughey was not there, and this was a mistaken shot. The question then is was this excessive force against McConaughey when the woman appeared at the door with a gun and then gunshots appeared. Nine gunshots were fired before Loveridge fired anything. And I looked at the video three or four times, and it was instantaneous. I mean, her shots were probably in the case of two or three seconds. She's moving across the front of the garage and firing her shots behind the officers as they're exiting. It's like she's providing cover. But quite apart from that, the question is she was not seizing Belton, and she never intended to seize Belton. She was trying to seize McConaughey. The question is, is that the framework for assessing excessive force against Belton? I'm not sure about that, but my bigger question is do we have any case law that's going to alert the officer to that? Well, to that particular question, no. To your earlier comment, if this was in fact McConaughey, then you're squarely in the McClennagan-Millstead cases, and the notice to the officer would be that two to four seconds, which is what I calculated right after an officer involved shooting an objective officer. But it's very instantaneous. She fired, I don't know how she got those shots off that quick, but she fired them and moved around. She was moving around, and the officers were exiting. And she fired in there, and it looked like she was providing cover for them as they exited. But the question is she clearly did not intend, nothing in the records, intend to hit Belton. That was a mistake. That's absolutely correct, and qualified immunity protects officers for reasonable mistakes. We would ask that this court reverse the denial of summary judgment for Officer Belton and find she's entitled to qualified, for Officer Loveridge, I'm sorry, and find that she's entitled to qualified immunity. Thank you. Thank you, Mr. Taylor. All right, Mr. Hayes. Your Honor, please escort. My name is Mark Hayes, and I represent Officer Clarence Belton, the plaintiff in this case. You have heard a lot of discussion about facts, but really that's not the place for this. This is not the place for that. In fact, this court is constrained by the findings that are in that order, and that's where we have to start. But that being said, I do want to go over some of the important facts about this case, which are that we have a respected veteran police officer and Officer Belton who was wounded. He was crawling on the ground. He was trying to escape danger. He's crawling along the side of the garage, not toward Officer Loveridge. If Loveridge understood it was Belton, this would be a grievous case. And unfortunately, you identify the facts, the factual dispute in this case in your brief, as to whether she recognized it was Belton or not. And this is what you say, quote, An officer cannot enjoy immunity for shooting someone she knows to be another officer legally performing his duty. You say again, Now that's where you couch the factual issue that whether she knew it was Belton or not. My suggestion to you, and you can now answer this, is that totally unreasonable suggestion of factual question, because that presumes that if she knew it was Belton, she would have shot him. Or she did shoot him, knowing it was him. That's murder, and that's not what's before us. What's before us, I believe, is she fired in that garage. Identification was not totally clear, but she made a mistake. She did not intend to hit Belton. She clearly was either trying to cover for their escape, or she was trying to hit what she maybe thought was McConaughey. I don't know that answer. But my whole question comes down to, this is a friendly fire case, like in the military. One officer is trying to do a job. Another officer is trying to do a job. Belton is a good officer trying to do a job. He got hit earlier. She was trying to do a job. They ended up, by mistake, hitting each other. Or she hit him with bullets. The question is, is that a constitutional violation to hit a fellow officer in that kind of circumstance? And I step back and I wonder, well, she's not making a seizure under the Fourth Amendment of Officer Belton. She hit him by mistake when carrying out her duties. And so it's a lot. I've raised a lot. But that was my concerns, and I'd love to have you address those. Your Honor, based on the finding of disputed fact in the order, which is where we have to limit our universe because this court cannot get into the facts, based on that finding that she saw him, knew he was an officer, and still shot him, a jury could do one of two things. First, it could conclude that she actually fired at him knowing he was an officer subjectively in her mind. And you may think, how is that possible? Have you ever been so overwhelmed with emotion, for example, that you hit a wall and you put a hole in it? Did you want there to be a hole in that wall? Did you want your hand to possibly be broken? No. But could I say I didn't intentionally do it? I didn't know what my hand was? It's not a mistake. How can you have a question of fact on that in view of her position? It was clearly a mistake from her point of view. Now the question is to contradict that and create a fact. All you've got is the notion that she could have recognized him in view of the circumstances, that there was light and he was crawling. I don't know how she would have recognized him on the floor because he had a jacket on. His police identification was on his front and he was crawling. Your Honor, I have more than that because I had the— Whatever it is. I mean, all the evidence you have that he could have been seen. The question is, do we have any evidence that she recognized him or thought it was Belton? We have the finding that we are bound by by this court that she looked at him, saw he was a cop, and shot him. From that, the jury could infer she actually subjectively intended to. We don't have to go there. Who is inferring murder then? I mean, that's just straight-on murder. You see somebody, you recognize them, shoot them for no purpose? Come on. I mean, perhaps, but we are bound by that order. But, again, we don't have to go there. Can I interrupt and finish your point? I was just going to say, we don't have to go there. The jury, you know, we are basically paralleling probable cause. So the jury just has to put an objective person in that point of view. And if the objective person in that point of view, after seeing someone and still shooting him, wouldn't have done that, well, that's the whole point. That proves it was unreasonable, which proves our case. It's not actually how it works. It's not a jury determining what's reasonable. That's the court determining reasonable. And the jury just resolves the disputed facts. But on the facts. But that's a separate – I want to get to a separate issue, or maybe separate, maybe related or not. Will you tell me what is the right that you say the officer leverage violated? Can you define the right that you're asserting here? I will do my best to do it, but I'll also point, Your Honor, to the Ailman case, especially when it's talking about Cooper. Really gets into that sort of stuff about, you know, does he have a clearly established right? That's where that's really talked about well. But I think just intuitively, a seizure – what is a seizure? Just in common, you know, parlance. It's to stop someone. Was Officer Belton moving? Yes. Was he stopped because he was shot? Yes. I mean, I think it's your obligation to tell – I mean, the law requires the court to decide whether the constitutional right that you're asserting is clearly established. And so – and it can't be at a high general level under the Supreme Court authority. So I think you have an obligation to say what's the right that you say is clearly established. And I'm just asking you to tell me what it is. It's the right not to be – not for an unarmed person where there's no cause to think this particular person is armed, just like that there may be guns out there, and that person is shot, that's a seizure. And that's what happens in Ailman. Yeah, but – and maybe that does it, but that doesn't account for this being an officer. And maybe you think an officer has no relevance in here, but Judge Niemeyer has asked some questions about it. I asked some earlier questions. And it might be that the fact that your client was an officer bears on the clearly established question of whether there's a clearly established right. Well, Your Honor, I would urge this court not to construct an argument for the city and for defendant leverage. If you take a look in the JA, it's got the transcript at the end of it. If you look at page 501 of the JA, you'll see the only time, as far as I can tell, and of course I was scanning this quickly as you all were asking him questions, that's the only time clearly established is even mentioned. And there's just a perfunctory we don't think there is one. The Supreme Court tells us we have to – I mean, we don't – I mean, people – a lot of people think qualified immunity is crazy. A lot of people think it's great. We're just following the Supreme Court law. I mean, the court has – if qualified immunity is raised, there's a way you've got to do it. You've got to say at prong one, was there a constitutional violation? Construe in the light the evidence in the light most favorable to the plaintiff. The district court really didn't do that, but he probably implicitly did that. I mean, we'd probably be nitpicky for us to say that, although he could have done it more clearly. But he didn't do anything with the required separate prong. He didn't say anything about what the right was and whether it was clearly established. And the reason you've got to do that is the Supreme Court tells us qualified immunity has to be resolved at the earliest possible way. And if you don't kind of do your – show your work there, we don't have a real way to say, hey, was that legal determination? That's a question of law, whether there's a right that was clearly established. I don't know what the right the court considered – what was the right that the court considered. I certainly don't know why it said it was clearly established if it even said that. So how do we – what are we to do here with that? Well, I think obviously it's implicit in the order. But at worst, I guess you would have a remand for clarity from the district court. I don't know if it's implicit. The reason I say this, you tried to characterize the right a minute ago as anytime you shoot somebody, it's a seizure. And the question is that would mean every common assault on the street, murder on the street, is a constitutional violation. I think the constitutional seizure relates to law enforcement. The state cannot search and seize an individual without due process, without probable cause, and without excessive force. We have a law enforcement effort behind every seizure that's being analyzed. The law enforcement effort here was not to seize Belton. And this was – Belton was not being seized, except in the common dictionary sense, but not in the constitutional sense. The constitutional sense would be the only person that could have been subject to the seizure here was the woman at the door and McConaghy head. And so that's my problem with the principle that we have an officer accidentally shooting another officer who the first officer did not intend to seize, how that is a constitutional violation. And then, of course, you have to have it where it's clearly understood by any reasonable officer. Right. Well, of course, you have to have a state actor. So your example is like assault on the street. So that's what we're looking for. Second, I think I keep hearing maybe an implication that there has to be an intent. I don't think that there does. It has to be de facto a seizure. Right. And he certainly stopped when he got shot 14 times. I mean – That was not a constitutional seizure. He was not a suspect. The law was not being enforced against him. He was not being brought in by the state. He was accidentally shot. And so the question is, is that a constitutional violation? Now, maybe there is some principle that you could apply the seizure effort against McConaughey head. That may be a legitimate argument, but I don't think you can just clearly say shooting a fellow officer violates the Constitution. I don't have a case for that, Your Honor, but I will say – I will just, I guess, urge that I feel like intent is slipping into this when it shouldn't. Well, there is – I mean, I actually think intent is required. Intent to shoot is required. I think there is a debate about whether if you shoot someone, officer leverage intended to shoot. The question is, when she shoots someone, that she has mistakes for someone else. Is that a seizure? If we're talking about non-officers, you know, there is some woe out there on that. And we're talking about officers. The only two cases I could find – and no offense, but you all didn't help me out much – was the Ninth Amendment and the Eighth Amendment cases. I mean, the Ninth Circuit and the Eighth Circuit cases. And so there is some support for your theory, but they're not Fourth Circuit cases and they're not Supreme Court cases. So that's kind of my situation is, how do we really know whether this is clearly established? We're usually a reviewing court, not the ones doing that in the first instance. Maybe we can do – maybe it's clear enough here where we do it in the first instance. But we don't really have any way that I can see that the district court – the district court says there's some questions of fact, but it doesn't allow us to do – review the clearly established prong of the analysis. Right, Your Honor. And I would just – I guess I would bring this back to just as a matter of, you know, who's bringing this motion? They are. They need to make these arguments. We shouldn't be constructing it for them. If they didn't make it, which they didn't, then I don't know that we should remand and give them another bite of the apple. I certainly haven't had a chance to respond to this. I'm doing it flat-footed because it wasn't briefed. Okay. I mean, I hear you there. But, I mean, we – I mean, immunity is a question that's before us. I mean, whether it was teased out as well as it could, I mean, I think your point is there. And were it granted, then we would be unwinding that ball. But it was denied, and so they didn't make their case. Just looping back to the interlocutory aspect of it, again, we're limited to that order. If we see appellant making arguments based on citing to the record and, you know, dancing around it, every one of those is a concession that they are moving outside the bounds of this interlocutory order. Can I ask you this, and maybe I don't fully understand it? What is or what are the core disputed facts that you think are material to addressing this issue in the context of the questions we've raised? Right. Well, we can just look on page 437. I'd like you to summarize it for me.  So how well lit the garage was.  What exactly Loveridge could see before she started shooting at plaintiff, so before, you know, in the garage. Whether the bullets struck and – or caused plaintiff's injuries, which really hasn't been contested here. That's not disputed. And whether Loveridge, quote, had the opportunity to see plaintiff before the doors breached. Loveridge denies that. Plaintiff further contends the evidence shows Loveridge could see that plaintiff was a law enforcement officer before she shot him. So if we – You're reciting exactly what I thought, which is the whole question of a disputed fact in this case, as I understand it, is whether Loveridge saw or should have seen Belkin as a law enforcement officer and not the suspect. Right. That is – That was based on the circumstantial facts of lighting and identification and the facts you've talked about. Right. So if that fact is resolved against her – At trial? Yeah. Well, yeah, at any – doesn't matter when right now for my purposes because you say it's a disputed fact. Then you have to conclude that this officer on one set of facts saw Belkin, recognized him, and shot him. Yes, Your Honor. And you said that three times in your brief, that that is the disputed fact. What if I conclude that that is an unreasonable conclusion? I would say – In the factual context. I would say – There's really no factual dispute that's material to the immunity issue. We would have to assume, to make that a material fact, that this woman, functioning as a police officer, firing her gun after nine shots had been fired, was – saw a fellow officer and deliberately hit him. This is what the factual conclusion leads to. So my question is, really, is that a factual dispute? It is, Your Honor. And I think we're – I think perhaps if I parse out the word mistake a little bit. I remember when I was in my young 20s, I changed the brake pads on my car for the first time without my dad around. It was very frustrating. Rusted old car. At some point I put a wrench on it, took a hammer to it, started tapping it. The bolts would not budge. And I got so frustrated, so flushed with emotion, that I took that hammer and I pounded it on the pavement. Did I want the pavement to break? No. Did I like the feeling that rung up my arm? No. Was it unintentional? Was it a mistake? It was a mistake in the sense I regretted it. But was it a mistake in the sense of I didn't know what I was doing? I didn't know I had a hammer? I didn't know that I was hitting – I didn't hit my toe. I knew I was hitting that pavement. She had gotten so flushed with emotion that sometimes you just try to release it. I saw the videotape and I looked at it. Regularly I look for different things. I look for her movement. I look for when the shots were fired. I look for when the other officers were exiting. Every time I looked for a different purpose. And I looked at her basically trying to exercise an officer's role. That is to either stop the person that they were seeking or to protect the officers. But she was shooting behind the officers. Two of them came out right away. And then after she started firing, a third one came out. But Belton was on the ground crawling, and that's who she ended up shooting. But the question I have is where is all this business about – you're talking about her anger and all this emotion. She looked very composed. Afterwards she stood there and put her gun in her holster. Your Honor, it comes from I think the same place of like we're kind of jumping the gun to intent. I'm not trying to go there. The question is – You were raising all this emotion, the fact that she got angry and slammed her hammer on the concrete. Yes, Your Honor. I mean I think implicit, I guess maybe what I'm getting and maybe I'm misunderstanding, is kind of the question behind the curtain is she's a good guy, he's a good guy. Why would a good guy shoot a good guy? And I'm providing an answer to that. We don't need the why. You're right, Your Honor. We don't need the why. All we need is the order. We need to have the state, the government through an officer seizing somebody else in respect to law enforcement. And here we have the government through leverage firing bullets against somebody else mistakenly and not trying to seize that person. Your Honor, I would just say that the order precludes that mistake. But let me just touch on a couple things. I have a very short time here. If you're going to jump the gun down to is it reasonable or not and what would a reasonable officer do, if we're getting down to that issue, I think it's very important – Is it for us to decide? I don't think it is for this court to decide. I thought reasonableness was a question of law. I'm sorry. I'm sorry. Yes. The question of reasonableness. If we're going to try to say what would a reasonable officer do, I think it's very important to look at what the city itself did. The shooting review, five cops on that board. They all said it's unreasonable. Not just unreasonable, not justified. We're not just going to punish her. We're going to fire her. It goes to internal affairs. More cops. Same thing. It would have been unreasonable if we assume what she is saying was true, that she thought it was the suspect because there was not – arguably there was not a reasonable threat for that amount of excessive force when somebody is crawling on the ground towards you. It's far, far different than the facts in Rambert. Exactly. Exactly. If we're going to reach another – an additional issue that was argued at the hearing but didn't make it into the order – I believe nine shots have been fired before she fired. Right. Let me just go to Justice Thacker – or Judge Thacker's question first, if I may, that there was no immediate threat. You look at Ailman. This was argued. Does anybody know where all the shots were coming from when she's sitting there trying to protect the officers? There were nine shots fired, almost simultaneous to hers. A few seconds after those shots were being fired, she's firing shots. Right. Now, you tell me there's no danger, there's no response, quick response. She is responsible for her 14 shots. And if you watch the video, which I urge this court to do in super slow motion if you can. She's backing up. She is backing up. There are vehicles that she could take cover behind if she really perceived a threat from a man crawling on the ground when there are others running at her. And when she first approached, she actually did that very thing. She took cover. She's able to back away. She's protecting the officers inside who are running out. That's what it looks like. Because as she's shooting, two of the officers are coming out, and she's shooting behind them. And then a third officer comes out. And while she's standing there at the garage and she's not retreating, she is firing behind them. She's protecting their rear. I would loop back to Ailman as well. They're standing there with a guy with a gun. The court says he is a threat, but he's not an immediate threat. Is the person who's crawling, not crawling toward her, not deviating toward her as she's backing away, she's able to move away? Is he an immediate threat? She knows where the nine bullets came from, the shots fired ahead of time. There were nine shots fired. And is she supposed to figure out where they came from before she fired? No, Your Honor, but we're following her 14 shots. She fired 14 in three seconds. Right. She fired her 14 shots while backing away. He's not headed toward her. He's on the ground. He doesn't have a gun. Nobody says he has a gun. She doesn't even say he has a gun. Right. There's none of that at all. And so does she have to shoot him? Let's just assume he's a suspect. The woman in the door too, isn't she there? She came to the door with a gun. I mean, we don't see what happens to the woman. No, we don't know where the shots came from, but this is the scene. In other words, there's a woman comes to the door. She has a gun in her hand. They batted the door down. She comes with a gun in her hand. There's shots fired. Yes, sir. Nine shots being fired, and she is not one of the nine shooters. And so she doesn't know where these shots are being fired. The officers are running out of the garage, and she's firing behind them. Right, but she's firing at somebody on the ground. She's not firing at where the shots were coming from. And the question is, is it an immediate threat? You look at Ailman. It says there was a threat, but it's not an immediate threat. It's interesting to think about this. Do you look at it as if Mr. Shelton was who Officer Loveridge thought it was?  I'm sorry, Belton. I apologize. Go ahead. No disrespect. No, so go ahead. I'm sorry. But do we look at it as if it was excessive force, from the perspective of whether it was not really Belton, but who Officer Loveridge thought it was? Or do we factor in that it's a police officer who was shot mistakenly? I don't really know, to be honest with you. I mean, those aren't necessarily the same questions, and that kind of gets to my point, is what right are we talking about? And, of course, it's not even excessive force. It's lethal force. We have these cases of lethal force. Lethal is a kind of version. Certainly. But anyway, I'm well over my time. You've helped us. Thank you very much.  I appreciate it. Thank you all. We'll hear back from Mr. Bader. Thank you. Three points I want to discuss with my remaining time, and the first gets to Judge Niemeyer's question about whether there is a factual dispute. Well, the contention that the district court recited was the plaintiff's contention that she could see he was an officer, and to Judge Niemeyer's point, then you're effectively talking about murder. Maybe you're talking about murder. And I get the point. Maybe that's an unreasonable look at the facts, but, I mean, maybe it's murder, but maybe it's mistaken manslaughter. Maybe. I don't know. But would you agree with this, that if Officer Loveridge, you could tell it was an officer, that would be an unreasonable act to shoot at the officer? I would agree, then, that that would be a question of law for the court. Well, yes. I mean, to your point, sure. If a fact finder says you're deliberately shooting at another officer and that would be a constitutional seizure, then you could. I guess it's deliberately shooting an officer. I hadn't really thought of that completely through, whether it's deliberately with malice to kill or whether you should have recognized it's an officer. Maybe you don't have quite the intent in the heat of the moment, but you should have. Look, I'm not so much interested . . . I mean, I think that's an interesting question. I don't know. The district court seems to have said there's a question of fact about reasonableness. Judge Niemeyer's question suggests maybe, and Rambert suggests that you can have a situation where what you say is a question of fact really . . . Well, I don't . . . It says questions may not be material. So that's a different point. I guess I don't want to get bogged down in this, but this is how I've synthesized this case, at least in my own mind. If the parties have . . . There's different evidentiary disputes as to what happened. So that Witt v. West Virginia State Police, the plaintiff's evidence is they took me to the ground, they were the aggressors, they hit me with the gun. The officer's evidence is the plaintiff was the aggressor, he was accidentally hit with the flashlight. You can't resolve reasonableness with those kind of factual disputes. Here, there's no dispute about the facts. It's all on video. The other evidence about them not knowing each other, covering up the jacket, that's all undisputed. So the question really becomes, well, was her reaction to him, which is really should she have identified him as an officer, which I would argue, should I have identified this person as mentally ill, you're in the same ballpark. So I still think the case can be resolved that way. I think the factual discussion is a very difficult one, and I understand the district court's conclusion on that. My biggest problem is that I can't . . . This is really my biggest question that I have to answer. Yates says the Fourth Amendment bars police officers from using excessive force to effectuate a seizure, and she was not in the process of effectuating a seizure on Belton. It was a mistake. She was trying to engage in what all the officers were trying to do is to seize McConaughey. And so the question is, the legal question is, can you use the seizure of McConaughey as a constitutional basis to give Belton a constitutional right? And the answer to that question I'm just not sure of. And I don't know the answer to that question either, Your Honor, but I think that that is the second issue I wanted to comment on, but really it teases out the third issue, which is the clearly established right, because this circuit has not said that officers involved in friendly fire, chaotic situations like this would have a clearly established right to be free from a mistake in shooting by one of their colleagues. And that really is what this case boils down to. It was a mistake. But what this Court has said time and time again . . . And you didn't argue anything about clearly established right below, correct? No, we certainly did. Okay, good. We certainly did. So we would ask that this Court reverse summary judgment, find that Officer Loveridge is entitled to a qualified immunity. Thank you. I'm fine with whatever you want to do. We'll come down and greet counsel and proceed on to the last case.
judges: Paul V. Niemeyer, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.